# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE COTY INC. STOCKHOLDER LITIGATION | ) ) ) ) ) | Consolidated C.A. No. 2019-0336-AGB |

## MEMORANDUM OPINION

Date Submitted: May 8, 2020
Date Decided: August 17, 2020

Ned Weinberger, LABATON SUCHAROW LLP, Wilmington, Delaware; Joel Friedlander, Jeffrey M. Gorris, and Christopher P. Quinn, FRIEDLANDER & GORRIS, P.A, Wilmington, Delaware; John Vielandi and David MacIsaac, LABATON SUCHAROW LLP, New York, New York; Jeremy S. Friedman and David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; D. Seamus Kaskela, KASKELA LAW LLC, Newtown Square, Pennsylvania; *Attorneys for Plaintiffs Massachusetts Laborers' Pension Fund, Charles Waddell and John Bicanich.*

Kevin R. Shannon, J. Matthew Belger, and Nicholas D. Mozal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendant Pierre Laubies.*

Gregory P. Williams, Raymond J. DiCamillo, Angela Lam, and Kevin M. Regan, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; James W. Ducayet, Nilofer Umar, Benjamin Friedman, and Zarine Alam, SIDLEY AUSTIN LLP, Chicago, Illinois; *Attorneys for Defendants Sabine Chalmers, Paul S. Michaels, Erhard Schoewel, and Robert Singer.*

Paul J. Lockwood, Alyssa S. O'Connell, and Bonnie W. David, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Lauren E. Aguiar, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendants Joachim Faber, Olivier Goudet, Peter Harf, Anna-Lena Kamenetzky, JAB Holding Company S.à.r.l., JAB Holdings B.V., JAB Cosmetics B.V. and Cottage Holdco B.V.*

Patricia L. Enerio and Aaron M. Nelson, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant Coty Inc.*

**BOUCHARD, Chancellor**

This case concerns a transaction in which a large conglomerate (JAB) increased its stake in Coty Inc. from approximately 40% to approximately 60% through a partial tender offer that closed in April 2019. JAB commenced the tender offer after overhauling Coty's management team but before disclosing the company's new strategic plan. In connection with the tender offer, JAB affiliates entered into a stockholders agreement requiring that two new independent directors be added to Coty's board of directors by September 2019 and that at least four independent directors serve on the board while the agreement is in effect.

Plaintiffs are stockholders of Coty. Their consolidated complaint contains four claims. The first two claims assert that Coty's directors and JAB as Coty's *de facto* controlling stockholder breached their fiduciary duties for their roles in initiating and approving the tender offer at an unfair price and through an unfair process. The other two claims are brought derivatively on behalf of Coty. They assert that JAB's affiliates breached obligations in the stockholders agreement to ensure the presence of independent directors on Coty's board and that Coty's directors caused and failed to remedy ongoing breaches of the stockholders agreement.

Each of the defendants moved to dismiss the complaint in whole or in part under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief. For the reasons explained below, each of defendants' grounds for dismissal fail.

1

## I.    BACKGROUND

Unless otherwise noted, the facts recited in this opinion are based on the allegations of the Verified Second Amended Class Action and Derivative Complaint ("Complaint") and documents incorporated therein.[1]   Any additional facts are subject to judicial notice.

### A.    The Players

On April 25, 2019, an affiliate of JAB Holding Company S.à.r.l. ("JAB Parent" and collectively with its affiliates, "JAB") completed a partial tender offer to acquire 150 million shares of Coty Inc. ("Coty" or the "Company"), increasing JAB's beneficial ownership of Coty's outstanding stock from approximately 40% to approximately 60% (the "Tender Offer").[2]

JAB is a German conglomerate, headquartered in Luxembourg, with an extensive portfolio of companies and a focus on long-term investments.[3]   JAB's portfolio includes, among others, Coty, Jacobs Douwe Egberts B.V., Krispy Kreme Doughnuts Corporation, Keurig Dr Pepper Inc., Panera Bread Company, and a

---

[1] Verified Second Am. Class Action and Deriv. Compl. ("Compl.") (Dkt. 55). *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

[2] Compl. Preamble; *id.* ¶¶ 2, 8, 147.

[3] *Id.* ¶¶ 24, 32, 39-40, 85, 164.

minority stake in Reckitt Benckiser PLC.[4]  The Reimann family owns the majority of JAB and is actively involved in the day-to-day operations of JAB's companies.[5] JAB appoints the board of directors for the Reimann family's foundation:  Benckiser Stifung Zunkunft (the "Benckiser Foundation").[6]

Nominal defendant Coty is a Delaware corporation and one of the world's largest beauty companies with operations in 46 countries across three divisions: Luxury Brands, Professional Beauty, and Consumer Beauty.[7]  JAB acquired Coty in 1992 and took it public in June 2013.[8]

The plaintiffs in this case are Massachusetts Laborers' Pension Fund, Charles Waddell, and John Bicanich ("Plaintiffs").  They allege they were Coty stockholders at the time of the Tender Offer and have held shares of Coty continuously since then.[9]  Each plaintiff served books and records demands on the Company concerning the Tender Offer.[10]

The defendants in this case consist of three entities affiliated with JAB Parent that hold shares in Coty and the nine members of Coty's board of directors (the

---

[4] *Id.* ¶ 24.

[5] *Id.* ¶¶ 33-37.

[6] *Id.* ¶ 16.

[7] *Id.* ¶¶ 13, 42.

[8] *Id.* ¶ 42.

[9] *Id.* ¶ 14.

[10] *Id.*

"Board") at the time of the Tender Offer: four directors affiliated with JAB and five other individuals (together, the "Individual Defendants").

The three affiliates of JAB Parent that holds shares of Coty are Defendants JAB Holdings B.V., JAB Cosmetics B.V., and Cottage Holdco B.V.[11] JAB Holdings is a private limited liability company organized under the laws of the Netherlands and is an indirectly wholly-owned subsidiary of JAB Parent.[12] JAB Cosmetics and Cottage Holdco are also private limited liability companies organized under the laws of the Netherlands but are wholly-owned subsidiaries of JAB Holdings.[13] This opinion refers to these three entities together as the "JAB Entities."

Defendants Joachim Faber, Olivier Goudet, Peter Harf, and Anna-Lena Kamenetzky have served on the Board since 2010, 2013, 1996, and January 2019, respectively.[14] Each serve in fiduciary roles at JAB entities.[15] Faber is Chairman of the Shareholder Committee of JAB Parent and serves on the board of the Benckiser Foundation along with Harf.[16] Goudet is Chief Executive Officer of JAB Parent and serves as one of two Managing Partners of JAB Parent along with Harf, who also

---

[11] *Id.* ¶¶ 25-27.

[12] *Id.* ¶ 25.

[13] *Id.* ¶¶ 26-27.

[14] *Id.* ¶¶ 16-19.

[15] *Id.* ¶ 50.

[16] *Id.* ¶¶ 16, 18.

serves as Chairman of JAB Parent.[17] Harf "describes himself as effectively an older brother" to the Riemann family members that own the majority of JAB.[18] Kamenetzky is a Partner and Head of Business Development of JAB Parent, Co-Head of JAB Consumer Fund, and a director of various JAB affiliates.[19] This opinion refers to these four directors, which Coty admits lack independence from JAB,[20] as the "JAB Directors."

The five remaining members of the Board are Pierre Laubies, Paul S. Michaels, Sabine Chalmers, Erhard Schoewel, and Robert Singer.[21] This opinion refers to four of these individuals who did not hold a management position at Coty (Michaels, Chalmers, Singer, and Schoewel) collectively as the "Outside Directors." Three of the Outside Directors (Chalmers, Singer, and Schoewel) served on a special committee of the Board formed to evaluate the Tender Offer (the "Special Committee"), with Schoewel as Chairman.

Laubies became Coty's Chief Executive Officer and a Coty director in November 2018. Before joining Coty, Laubies served as a senior executive of Mars,

---

[17] *Id.* ¶¶ 17, 18.

[18] *Id.* ¶ 37.

[19] *Id.* ¶ 19.

[20] *Id.* ¶ 50.

[21] *Id.* ¶¶ 15, 21-23.

5

Incorporated, overlapping with several JAB partners, and then as CEO of one of JAB's affiliates, Jacobs Douwe Egberts, from September 2013 to December 2017.[22]

Michaels joined the Coty Board in 2015 after serving as President of Mars from 2004 to January 2015, overlapping with Goudet's tenure as CFO and advisor to the board of directors, and other JAB partners' tenures at Mars.[23] In 2017 and 2018, JAB appointed Michaels to the boards of JAB affiliates Krispy Kreme Doughnuts and Keurig Dr Pepper.[24]

Chalmers joined the Coty Board in 2017, after serving as a senior executive of Anheuser-Busch InBev SA/NV ("AB InBev") for twelve years. During Chalmers' tenure at AB InBev, Harf and then Goudet served as Chairman of AB InBev's board of directors.[25] Chalmers co-chaired galas with both Harf and Goudet in 2016 and 2017 and was appointed to the AB InBev board in 2019.[26]

Schoewel worked for JAB controlled entities for over 25 years until he retired in 2006, when he joined the Coty Board.[27] Schoewel also serves on the board of the Benckiser Foundation along with Harf and Faber and has invested approximately

---

[22] *Id.* ¶¶ 20, 77-78.

[23] *Id.* ¶¶ 17, 21, 73-74.

[24] *Id.* ¶¶ 73, 75.

[25] *Id.* ¶¶ 15, 17, 63, 66.

[26] *Id.* ¶¶ 68-69, 71.

[27] *Id.* ¶¶ 22, 51-52.

6

$8.5 million in JAB Consumer Funds—an exclusive JAB affiliate.[28]  Schoewel's own family foundation is housed within the Benckiser Foundation, which provides, among other things, office space, lectures, and consulting services, and initiates and finances independent research projects.[29]

Singer joined the Coty Board in 2010 when JAB privately-owned Coty.  Since 2010, Singer has served as a director of various JAB affiliates, including Panera Bread and Keurig Dr Pepper, and on the board of directors of several entities privately owned by JAB.[30]  Singer is also a paid consultant for JAB and received $175,000 and $200,000 in consulting fees from JAB in 2017 and 2018, respectively.[31]

## B. The P&G Transaction and Coty's Leadership Change

In October 2016, Coty merged with Proctor & Gamble's specialty beauty business, which more than doubled Coty's size.[32]  After the transaction, JAB lost its voting control over Coty and owned approximately 36% of Coty's fully-diluted

---

[28] *Id.* ¶¶ 53-54.

[29] *Id.* ¶¶ 55-56.

[30] *Id.* ¶ 59.

[31] *Id.* ¶¶ 23, 59-60.

[32] *Id.* ¶¶ 46, 80.

common shares.[33]  Due to the transaction's structure, JAB was restricted from acquiring majority control of Coty for two years.[34]

Coty struggled with integration issues and problems in its Consumer Beauty division in 2018 and announced the resignation of its CFO in August 2018.[35]  In November 2018, Coty announced that Laubies would become CEO, Harf would become Chairman of the Board, and Schoewel was appointed the new Lead Independent Director.[36]  In January 2019, Coty experienced further management changes.  On February 8, 2019, Coty announced it had beat estimates for sales and earnings, that management had begun to stabilize the business, and that its "immediate objective is to finalize a Strategic Plan" for future growth.[37]

## C.    JAB Proposes a Tender Offer

On February 12, 2019, Harf sent a publicly filed letter on behalf of JAB Parent to the Board, informing Coty's directors that a JAB affiliate would commence a tender offer to acquire up to 150 million—but not less than 50 million—additional Coty shares for $11.65 per share (the "JAB Proposal").[38]  The JAB Proposal

---

[33] *Id.* ¶¶ 46-47, 85.

[34] *Id.* ¶ 85.

[35] *Id.* ¶¶ 83-84, 87.

[36] *Id.* ¶¶ 90-91.

[37] *Id.* ¶¶ 95-96, 99, 101.

[38] *Id.* ¶¶ 103-04; *see also* Weinberger Aff. Ex. A ("JAB Proposal"), at 1.

8

contemplated JAB increasing its Coty stockholdings from approximately 40% to a minimum of 47% and a maximum of 60%.[39] It stated that "[i]f shareholders tender more than 150 million shares of Common Stock, [JAB] will purchase such shares on a pro rata basis."[40] The JAB Proposal was conditioned on "the independent directors of the Company" approving the Tender Offer and "recommend[ing] that the Company's shareholders accept" the Tender Offer.[41]

According to the JAB Proposal, the proposed Tender Offer represented "a premium of approximately 38% to the 90-day volume-weighted average share price as of [February 11, 2019], a premium of approximately 51% to the 30-day volume-weighted average share price as of [February 11, 2019], and approximately a 21% premium to [the] closing share price" on February 11, 2019.[42] By contrast, the JAB Proposal represented a considerable discount compared to Coty's 52-week high of $21.53 per share and to the estimated "intrinsic value" of the shares ($22.00) according to a recent BMO Capital Markets analyst report.[43]

---

[39] Compl. ¶¶ 48, 105.

[40] JAB Proposal at 1.

[41] *Id.* at 2.

[42] *Id.* at 1.

[43] Compl. ¶¶ 103, 110.

On February 13, 2019, the day after making the JAB Proposal, JAB launched the Tender Offer.[44]

On February 14, 2019, the Board resolved by unanimous written consent to form the Special Committee to evaluate and determine how to respond to the Tender Offer.[45] The Board resolved that Schoewel, Singer, and Chalmers did not have "any interest in, or in connection with, any Potential Transaction, including the Tender Offer, that is different from the interests of the Company's stockholders generally."[46]

## D. The Special Committee Process

Shortly after its formation, the Special Committee retained Sidley Austin LLP as its legal advisor and Centerview Partners LLC ("Centerview") as its financial advisor.[47] On February 20, 2019, the Special Committee held a meeting that, according to the minutes, included a discussion of "each member's potential conflicts of interest in connection with the transaction, including with respect to JAB and its affiliates."[48] The Special Committee then "determined that each member of the Committee does not have any material interest in, or in connection with, the Offer

---

[44] *Id.* ¶ 108.

[45] *Id.* ¶¶ 5, 111-12.

[46] *Id.* ¶ 112.

[47] *Id.* ¶¶ 119, 124.

[48] *Id.* ¶ 115.

that is different from the interests of the Company's stockholders generally."[49] Absent from the minutes are any indication that the Special Committee made a determination as to the independence and disinterestedness of its members from JAB. Around this time, each member of the Board completed questionnaires in connection with the Tender Offer, which sought information concerning their independence.[50]

As the Special Committee evaluated the Tender Offer over the next month, JAB consistently communicated that it would terminate the Tender Offer if the Special Committee was not prepared to recommend it in a timely fashion.[51] Centerview informed the Special Committee that the Tender Offer came at a "highly complex time" on the heels of a "new [management] team for Coty" that had not completed its strategic plan:

> although the new senior management team had commenced a strategic planning process, that process had not yet matured to the point at which a strategic plan or accompanying financial projections had been completed, and the results of that process were not expected to be available until May 2019 at the earliest.[52]

---

[49] *Id.*

[50] *Id.* ¶ 117.

[51] *Id.* ¶¶ 125-27.

[52] *Id.* ¶ 130.

The Special Committee directed Centerview to work with Laubies and Coty's CFO to modify the previous management team's projections consistent with the nascent strategic plan.[53]

The Special Committee sought an increase of the Tender Offer price once, without providing a counter offer price or minimum price.[54] JAB would not engage in monetary negotiations with the Special Committee, but agreed to two non-monetary changes to the Tender Offer terms: (i) raising the minimum share tender condition so that if the Tender Offer was consummated, JAB would own at least 50.1% of the outstanding shares; and (ii) entering into a Stockholders Agreement.[55]

On March 17, 2019, the Special Committee recommended that the Board approve the Stockholders Agreement and recommend that stockholders tender their shares to JAB.[56] Later on March 17, the Board voted to accept the Special Committee's recommendation, with the JAB Directors recusing themselves from the Board vote.[57] Coty and the JAB Entities entered into the Stockholders Agreement

---

[53] *Id.* ¶¶ 131-32.

[54] *Id.* ¶ 137.

[55] *Id.* ¶¶ 104, 138-43.

[56] *Id.* ¶ 146.

[57] *Id.*; Regan Aff. Ex. A ("Recommendation Statement"), at 18-19 (Dkt. 66).

that same day.[58] The Stockholders Agreement includes the following provisions that were intended to protect Coty's minority stockholders:

- A three-year prohibition on the JAB Entities transferring shares to third parties if those parties would own in excess of 20% of Coty's voting power following the transfer.[59]

- Covenants relating to the Board's composition, including that the JAB Entities and the Company cause the election to the Board of at least four directors that are independent from JAB and two new independent directors "by no later than September 30, 2019."[60]

- Restrictions requiring approval of related party transactions by Coty's "Independent Directors."[61]

- A three-year prohibition on the JAB Entities acquiring more than 9% of Coty stock without "Disinterested Director Approval."[62]

### E. The Recommendation Statement and Post-Tender Offer Events

On March 18, 2019, Coty filed its Schedule 14-D Solicitation/Recommendation Statement (the "Recommendation Statement"). The

---

[58] Regan Aff. Ex. B ("Stockholders Agreement") Preamble.

[59] *Id.* § 2.01(a).

[60] *Id.* § 3.01.

[61] *Id.* § 3.02. "Independent Director" is defined as "a director on the Board that qualifies as 'independent' under the requirements of Rule 10A-3 under the Exchange Act and Applicable Governance Rules." *Id.* at 3.

[62] *Id.* § 3.03(a). "Disinterested Director Approval" is defined as "the affirmative approval of a special committee of the Board comprised solely of Independent Directors who are disinterested and independent under Delaware Law as to the matter under consideration, duly obtained in accordance with the applicable provisions of the Company's organizational documents, applicable law and Applicable Governances Rules." *Id.* at 2.

13

Recommendation Statement stated that, "[o]ther than Messrs. Goudet, Harf and Faber and Ms. Kamenetzky, the Company is not aware of any actual or potential material conflicts of interest between any of the Company's executives and directors, including members of the Special Committee, and the Company."[63] It also made several references to the "independent directors" of the Special Committee,[64] but omitted information regarding the professional history and relationships between JAB and the Outside Directors, including the members of the Special Committee.[65]

The Recommendation Statement stated that the information on the Company's website, which included certain biographical information on the directors, "should not be considered part of this statement or incorporated herein by reference."[66] It also did not fully incorporate the Company's last annual proxy statement, which included certain director biographical information, but only "incorporated specific portions of that proxy statement and excluded the portions that contain[ed] the Special Committee members' biographical information."[67]

---

[63] Compl. ¶ 150.

[64] *Id.* ¶ 152.

[65] *Id.* ¶ 153.

[66] *Id.*

[67] *Id.* ¶ 154.

On April 25, 2019, the Tender Offer expired. More than 336 million shares were tendered, representing approximately 75% of Coty's publicly-owned shares.[68] On April 30, 2019, JAB accepted for purchase the maximum of 150 million shares, which resulted in a proration factor of approximately 44.56% and a total purchase price of approximately $1.75 billion.[69]

On May 8, 2019, Coty announced its fiscal year 2019 third quarter earnings, which beat analyst expectations.[70] The next day, during an earnings call, Coty executives confirmed that the Company had resolved its supply chain issues and Laubies previewed the new strategic plan, which would begin to rollout in late June 2019.[71] By May 17, 2019, Coty's stock price had increased approximately 25%, from a close of $10.82 per share on April 30, 2019, the date the Tender Offer was consummated, to a close of $13.50 per share.[72]

In September 2019, three new directors were added to the Board.[73] One of them, Joachim Creus, is a dual fiduciary who serves as a senior executive at various JAB entities and admittedly is not independent of JAB.[74] The other two directors,

---

[68] *Id.* ¶ 8.

[69] *Id.*

[70] *Id.* ¶ 163.

[71] *Id.* ¶¶ 165-67.

[72] *Id.* ¶ 172.

[73] *Id.* ¶ 176.

[74] *Id.*

Pierre Denis and Beatrice Ballini, both have strong ties to JAB and relationships with JAB managing partners.[75]

## II. PROCEDURAL HISTORY

In May 2019, Plaintiffs each filed separate actions challenging the Tender Offer, which the court consolidated.[76] On October 21, 2019, Plaintiffs filed the Verified Second Amended Class Action and Derivative Complaint (as defined above, the "Complaint").[77]

The Complaint asserts four claims: two class action claims concerning the Tender Offer (Counts I and II) and two derivative claims relating to the Stockholders Agreement (Counts III and IV).

Count I asserts that the Individual Defendants breached their fiduciary duties because they (i) "knowingly failed to adequately consider whether any member of the Special Committee was actually independent of JAB," (ii) "intentionally submitted false Questionnaires concerning the independence of the Company's directors and officers, including the Special Committee members," and (iii) "failed to disclose all material information concerning the Tender Offer and the conflicts of interest of the Special Committee members in the [Recommendation Statement]."[78]

---

[75] *Id.* ¶¶ 177-78.

[76] Dkt. 4.

[77] Compl.

[78] *Id.* ¶¶ 204, 206.

Count II asserts that the JAB Entities breached their fiduciary duties in their capacity as the Company's *de facto* controlling stockholder because they "opportunistically timed and priced the Tender Offer so that it undervalued Coty and structured it in a coercive manner."[79]

Count III asserts, derivatively on behalf of the Company, that the JAB Entities breached Section 3.01 of the Stockholders Agreement by (i) failing "to cause the election to the Board of at least four independent directors who are disinterested" as relates to the JAB Entities and their affiliates and (ii) failing to elect two new independent directors in September 2019.[80] Count IV asserts a fiduciary duty claim on behalf of the Company against the Individual Defendants for causing and failing to remedy the Company's continuing breaches of Section 3.01 of the Stockholders Agreement.[81]

In November 2019, each of the Defendants moved to dismiss the Complaint in whole or in part under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[82] On May 8, 2020, after briefing and argument, Plaintiffs and the JAB Entities stipulated to the dismissal of JAB Parent without prejudice and the

---

[79] *Id.* ¶¶ 209, 211.

[80] *Id.* ¶¶ 213-17.

[81] *Id.* ¶¶ 218-23.

[82] Dkt. 61; Dkt. 65; Dkt. 68.

withdrawal of the JAB Entities' motion to dismiss Count II for lack of personal jurisdiction.[83]

## III. ANALYSIS

The standards governing a motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[84]

Before turning to the issues raised in Defendants' motions, it bears mention what is not at issue. The JAB Entities concede for present purposes that the Tender Offer is subject to entire fairness review and advance no argument that Count II fails to state a claim for relief as to stockholders who tendered and received consideration for their shares. Their primary opposition to Count II was based on a personal jurisdiction defense they have since abandoned.

The Outside Directors, who filed an answer to the Complaint, do not dispute that Count I states a claim for breach of fiduciary duty against them and moved to dismiss Count I only in part. Specifically, the Outside Directors and all other

---

[83] Dkt. 116.

[84] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal quotations and citations omitted).

18

Defendants assert that the class claims for breach of fiduciary duty must be dismissed insofar as they are asserted on behalf of the so-called "Non-Tendering Stockholders." That term is a misnomer. As clarified during oral argument, the Defendants seek to partially dismiss the class claims to the extent they are brought on behalf of stockholders of the Company (i) who did not tender any of their shares or (ii) who tendered some or all of their shares but continued to hold shares of the Company after the Tender Offer due to proration.[85] With respect to the latter category, Defendants contend that tendering stockholders should not be able to seek relief with respect to the shares such stockholders continued to hold after the Tender Offer.[86] This decision refers to stockholders falling within either category as the "Remaining Stockholders."

Defendants' motions raise essentially four issues. First, does Count I state a non-exculpated claim for breach of fiduciary duty against Laubies as a director? Second, does Count I state a claim for breach of fiduciary duty against the JAB Directors? Third, does the Complaint state derivative claims for breach of contract and breach of fiduciary duty with respect to the Stockholders Agreement? Fourth, does the Complaint sufficiently allege that the Remaining Stockholders were harmed by the Tender Offer? The court addresses each issue in turn below.

---

[85] Mot. to Dismiss Hr'g Tr. 13, 133-35 (Apr. 21, 2020) (Dkt. 117).

[86] *Id.*

19

## A. Laubies' *Cornerstone* Defense

Coty's certificate of incorporation contains a provision exculpating its directors from breaches of the duty of care, as permitted under Section 102(b)(7) of the Delaware General Corporation Law.[87] As our Supreme Court explained in *In re Cornerstone Therapeutics Inc, Stockholder Litigation*, "[w]hen a director is protected by an exculpatory charter provision, a plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[88]

Laubies contends that Plaintiffs have failed to allege a non-exculpated claim against him as a director of Coty. Focusing on the second *Cornerstone* inquiry, Laubies implicitly concedes his lack of independence from JAB by not arguing otherwise,[89] but contends that Plaintiffs have failed to allege that he acted to advance the self-interest of JAB in connection with the Tender Offer. The court disagrees.

---

[87] *See* Regan Aff. Ex. F Art. VIII; *see also McMillan v. Intercargo Corp.*, 768 A.2d 492, 501 n.40 (Del. Ch. 2000) (noting the court may take judicial notice of the Company's certificate of incorporation).

[88] 115 A.3d 1773, 1179-80 (Del. 2015).

[89] This concession is not surprising. *See In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *35 (Del. Ch. Jan. 2016) ("Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller.").

There are sufficient facts in the Complaint to support a rational inference that Laubies acted to advance the self-interest of JAB with respect to the Tender Offer. In addition to voting to "approve the Stockholders Agreement and recommend that stockholders tender their shares to JAB," Laubies, as Coty's CEO, allegedly "made sure the projections" the Special Committee and its financial advisor (Centerview) used in connection with the Tender Offer "were understated" and "kept the market in the dark" about Coty's strategic plan, which "helped create uncertainty to benefit JAB's plan to acquire majority ownership at the expense of Coty's public stockholders."[90]

As this court recently held in *Voigt v. Metcalf*, a director who also serves as an officer is not entitled to the protection of Section 102(b)(7) if the complaint contains allegations to support a rational inference that "he may have acted out of loyalty to [the controller]" and "could have breached his duties in his capacity as an officer."[91] The Complaint does so here as to Laubies.[92] Thus, Laubies is not entitled

---

[90] Compl. ¶¶ 102, 133-34, 146.

[91] 2020 WL 614999, at *27 (Del. Ch. Feb. 10, 2020) (holding that a director who also served as CEO was not entitled to the protection of Section 102(b)(7) because he allegedly "provid[ed] his assessment of the Challenged Transaction to the Board and advocate[ed] in favor of the deal" in his capacity as an officer).

[92] Although Count I is asserted against the Individual Defendants "as directors and/or officers of Coty" and Laubies is the only Individual Defendant who served as an officer of Coty (*see* Compl. ¶¶ 15-23, 201), Laubies did not argue for dismissal of Count I in his capacity as an officer until his reply brief, thus waiving the argument. *See Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013) ("Under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities

to the protection of Section 102(b)(7) at the pleadings stage and the motion to dismiss Count I against him will be denied.

## B. The JAB Directors' Abstention Defense

Over twenty-five years ago, then Vice Chancellor Jacobs explained in *In re Tri-Star Pictures, Inc.* that "Delaware law clearly prescribes that a director who plays *no role* in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful."[93]  As this court more recently stated the principle, a "director can avoid liability for an interested transaction by *totally abstaining* from any participation in the transaction."[94]

Relying on *Tri-Star*, the JAB Directors assert that Count I should be dismissed as to them because "none of the JAB Directors played a role in determining whether the Board would recommend that Coty stockholders tender their shares in the Tender Offer – none served on the Special Committee, and they all recused themselves from

---

and arguments supporting its motion").  Laubies' opening brief instead was limited to an exculpation defense, which does not apply to corporate officers. *See Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").  In any event, the acts described above that Laubies allegedly took as Coty's CEO to aid JAB independently support a reasonably conceivable claim against him for breach of his duty of loyalty as an officer.

[93] 1995 WL 106520, at *2 (Del. Ch. Mar. 9, 1995) (emphasis added).

[94] *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *15 (Del. Ch. Mar. 15, 2019) (emphasis added).

the Board's March 17, 2019 decision to recommend the Tender Offer."[95]   The

challenge to making this argument now, at the pleadings stage, is that the abstention

principle explained in *Tri-Star* is not absolute and often implicates factual questions

that cannot be resolved on the pleadings.

*Tri-Star* itself involved a motion for summary judgment that was decided

based on undisputed facts.[96]   And there, the court posed a hypothetical to illustrate

that simply abstaining from a vote would not exonerate a fiduciary:

> One might, for example, imagine a scenario in which certain members
> of the board of directors conspire with others to formulate a transaction
> that is later claimed to be wrongful. As part of the conspiracy, those
> directors then deliberately absent themselves from the directors'
> meeting at which the proposal is to be voted upon, specifically to shield
> themselves from any exposure to liability.  In such circumstances it is
> highly unlikely that those directors' "nonvote" would be accorded
> exculpatory significance. [97]

Recently, based on a careful review of this court's precedents, Vice

Chancellor Laster described in *Voigt* other scenarios that would preclude applying

the abstention principle and why the "factual nuances underlying this rule" often

necessitate the development of a discovery record before the rule can be applied:

---

[95] JAB Opening Br. 26-27 (Dkt. 68).

[96] 1995 WL 106520, at *2-3.

[97] *Id.*

23

Similarly, an absent director who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors. Or a court might hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director was closely involved with the challenged transaction from the very beginning and the transaction was rendered unfair based, in large part, on the director's involvement. More generally, this court may hold an absent director liable if the director played a role in the negotiation, structuring, or approval of the proposal. Given the factual nuances underlying this rule, it is no surprise that the leading cases have not addressed the issue at the pleadings stage, but rather in post-trial rulings or on a motion for summary judgment.[98]

The factual context of *Voigt* also is instructive. There, the directors in question were dual fiduciaries for the acquirer and its alleged controller (CD&R), which stood on both sides of the challenged transaction.[99] The court held that the directors affiliated with CD&R were not entitled to dismissal at the pleading stage simply because they recused themselves from the board's discussion of the challenged transaction and abstained from voting on the deal.[100] The court reasoned it was "not clear at this stage precisely when the CD&R directors were participating solely as representatives of CD&R" and "making [that] capacity determination"

---

[98] 2020 WL 614999, at *27 (internal quotation marks, citations, and alterations omitted).

[99] *Id.* at *28.

[100] *Id.*

24

impermissibly "would require drawing inferences in favor of the defendants, rather than the plaintiff."[101]

Here, the Complaint alleges that each of the JAB Directors, who served as dual fiduciaries for Coty and JAB, failed to disclose in their Coty director questionnaires all of their relationships with the Special Committee members, which allegedly caused Coty to distribute a Recommendation Statement that misleadingly portrayed the Special Committee members to be independent.[102] Notably, that Recommendation Statement suggests that the JAB Directors—unlike the directors in *Tri-Star* and *Voigt* who invoked the abstention principle[103]—participated in the key board meeting before the vote on the challenged action: "The representatives of the JAB Group who are members of the Board discussed with the Board their reasons for making the Offer, including their belief that the Offer represents a strong public expression of support for the Company and its management team" before "Messrs. Harf, Faber and Goudet and Ms. Kamenetzky excused themselves from the meeting."[104]

Based on these facts, it is reasonably conceivable that the JAB Directors did not totally abstain from the process by which the Tender Offer was approved.

---

[101] *Id.*

[102] Compl. ¶¶ 16-19, 117-18.

[103] *Tri-Star*, 1995 WL 106520, at *2-3; *Voigt*, 2020 WL 614999, at *27.

[104] Recommendation Statement at 18.

Ascertaining whether the JAB Directors "complied with their fiduciary duties" thus "requires fact-specific analyses that cannot be conducted on a motion to dismiss."[105] Accordingly, the JAB Directors' motion to dismiss Count I of the Complaint must be denied.

### C. The Stockholders Agreement Claims

Count III of the Complaint asserts that the JAB Entities breached Section 3.01 of the Stockholders Agreement because Coty has no independent directors. Count IV asserts the Individual Defendants breached their fiduciary duties by causing and failing to remedy the Company's breaches of the Stockholders Agreement. Defendants contend that both claims fail to state a claim for relief. The court analyzes each of these challenges in turn.

#### 1. The Breach of Contract Claim (Count III)

To establish a claim for breach of contract under Delaware law, a plaintiff must prove: (i) the existence of a valid and enforceable contract; (ii) that the defendants breached the contract; and (iii) that the plaintiff was damaged as a result of those breaches.[106] Defendants' motions focus on the second element.

Section 3.01 of the Stockholders Agreement requires that the Company and the JAB Entities ensure that (i) at least four "Independent Directors" are elected to

---

[105] *Voigt*, 2020 WL 614999, at *27-28.

[106] *Ivize of Milwaukee, LLC v. Compex Litig. Supp., LLC*, 2009 WL 1111179, at *8 (Del. Ch. Apr. 27, 2009) (citations omitted).

the Board and (ii) two new "Independent Directors" are elected to the Board before

the end of September 2019:

> (a) For so long as this Agreement is in effect, the Company and each Stockholder [*i.e.*, the JAB Entities] shall take all necessary actions within their control . . . so as to cause to be elected to the Board, and to cause to continue in office, at any given time, *no fewer than four (4) Independent Directors* who are disinterested as it relates to the Stockholders and their respective Affiliates . . . .

> (b) The Company and each Stockholder shall take all necessary actions within their control . . . so as to cause, no later than September 30, 2019, to be elected to the Board *two (2) new Independent Directors* who are disinterested as it relates to the Stockholders and their respective Affiliates . . . .[107]

The independence test embedded in Section 3.01 has two elements.[108] The first

comes from the definition of "Independent Director," which requires the directors to

qualify as "independent" under "the Exchange Act and Applicable Governance

Rules."[109] The second comes from the text of Section 3.01, quoted above, which

requires the directors to be disinterested with respect to JAB.[110] This opinion refers

---

[107] Stockholders Agreement § 3.01 (emphasis added). Under the Stockholders Agreement, certain powers are delegated to these "Independent Directors." *See, e.g.*, *id.* § 3.02 (independent director approval of related party transactions); § 3.03(b) (independent director approval of going private transaction); § 4.09 (independent directors can agree to amend to remove protections).

[108] Recommendation Statement at 21 (defining directors who meet both prongs as "Independent Directors" under the Stockholders Agreement).

[109] Stockholders Agreement at 2 (definition of "Independent Director").

[110] *Id.* § 3.01.

to directors that meet both of these requirements as "Section 3.01 Independent Directors."

Defendants do not argue as a factual matter that any of the Coty directors satisfy the independence test embedded in Section 3.01. This is unsurprising given that the Complaint contains detailed factual allegations of a web of relationships between JAB and each member of the Board, calling into question each of the Individual Defendants' independence from JAB.[111]

Defendants instead assert that Plaintiffs fail to plead a viable breach of Section 3.01(a) of the Stockholders Agreement on the theory that the Stockholders Agreement stipulates that the Outside Directors are Section 3.01 Independent Directors,[112] as follows:

> For the avoidance of doubt, as of the date hereof [*i.e.*, March 17, 2019], each of Sabine Chalmers, Erhard Schoewel, Robert Singer and Paul S. Michaels are Independent Directors who are disinterested as it relates to the Stockholders and their respective Affiliates.[113]

This opinion refers to this provision as the "Independent Director Representation."

---

[111] Compl. ¶¶ 15-23, 49-79, 117, 176-78; *see supra* Part I.A.

[112] None of the Defendants substantively addressed in their briefs Plaintiffs' contention that the JAB Entities breached Section 3.01(b), thus waiving that issue. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[113] JAB Opening Br. 57 (quoting Stockholders Agreement § 3.01(a)); Stockholders Agreement, Preamble.

28

According to Defendants, the Independent Director Representation "makes the intent of the parties to the Stockholders Agreement clear: the parties intended to consider Chalmers, Schoewel, Singer and Michaels as disinterested directors, notwithstanding any potential argument otherwise (including by a stockholder plaintiff)."[114] Based on this representation, Defendants assert there can be no breach of the Stockholders Agreement for failure to cause the election of four Section 3.01 Independent Directors to the Board because the Outside Directors were deemed to satisfy the independence test embedded in Section 3.01.

Plaintiffs respond that the Complaint states a claim for breach of Section 3.01 because the Independent Director Representation "does not speak to director independence after the date of the Stockholders Agreement and after the closing of the Tender Offer, at which point any objective analysis would conclude that the four directors clearly lacked independence from JAB and its affiliates."[115] According to Plaintiffs, the Independent Director Representation only speaks "as of" the date of the Stockholders Agreement, *i.e.*, March 17, 2019, because it was intended only to "protect the formation" of the Stockholders Agreement.[116] In other words, this temporal qualification was intended to preclude a challenge to the authority of the

---

[114] JAB Opening Br. 58.

[115] Pls.' Answering Br. 36 (Dkt. 82).

[116] Mot. to Dismiss Hr'g Tr. 100.

Outside Directors to approve the Stockholders Agreement on behalf of the Company for lack of independence from JAB—nothing more and nothing less.

Defendants counter that the "obvious purpose" of the Independent Director Representation was to apply "as of March 17 *and on a going-forward basis*, unless any material facts changed"[117] and that the "correct interpretation" of the provision is that the Outside Directors "will be considered Independent Directors under Section 3.01(a) *until the facts that existed as of March 17, 2019* change in a way that bears on the definition of Independent Director in the contract."[118] Significantly, however, the forward-looking language Defendants' briefs urge the court to read into Section 3.01(a) does not appear in the contract.

On a motion to dismiss a contract claim for failure to state a claim for relief, the court "cannot choose between two differing reasonable interpretations of ambiguous documents."[119] "Dismissal is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law."[120]

Here, Plaintiffs offer a reasonable interpretation of the Independent Director Representation that accords with its plain language, *i.e.*, that the representation

---

[117] Outside Dirs. Opening Br. 22 (Dkt. 65).

[118] Outside Dirs. Reply Br. 9 (Dkt. 90).

[119] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[120] *Id.*

applies only as of March 17, 2019—the date on which the Stockholders Agreement was entered into and on which the Outside Directors voted to approve the Tender Offer—and does not apply on a going-forward basis. Given this competing interpretation and the existence of factual disputes concerning whether any, much less four, members of the Board satisfy the independence standard embedded in Section 3.01, Count III states a claim for breach of the Stockholders Agreement.[121]

The JAB Entities assert as a second line of attack what ordinarily would be a threshold issue, *i.e.*, that Plaintiffs lack standing to bring Count III. Specifically, they contend that Plaintiffs cannot sue to enforce the contractual obligations of the Company because "Section 4.13(b) of the Stockholders Agreement provides that the 'Independent Directors'—not Coty stockholders—'have the authority to authorize and direct the Company to enforce its rights under this Agreement.'"[122] Plaintiffs counter that they may bring a claim for breach of the Stockholders Agreement on behalf of the Company because the language in Section 4.13(b) is "non-exclusive."[123] The court agrees.

---

[121] Because the court concludes that the Independent Director Representation is susceptible to more than one reasonable interpretation and does not bar Plaintiffs' breach of contract claim, the court does not reach Plaintiffs' arguments that Defendants obtained contractual rights through fraud and breach of fiduciary duty. Pls.' Answering Br. 38-41.

[122] JAB Opening Br. 58 (quoting Stockholders Agreement § 4.13(b)).

[123] Pls.' Answering Br. 34. Plaintiffs also argue that if Section 4.13(b) seeks to "vest contract enforcement exclusively with directors, and to divest stockholders of the power to

The plain language of Section 4.13(b) does not vest exclusive enforcement authority with the Section 3.01 Independent Directors. It simply provides that they are authorized to act on behalf of the Company if the Company seeks remedies under the Stockholders Agreement against JAB. Because the other five members of the Board are admittedly beholden to JAB,[124] it is logical that the Stockholders Agreement would clarify that the four Section 3.01 Independent Directors would have the authority to enforce the Company's rights under the agreement, but that does not mean that they have the exclusive authority to do so. Had that been the intent of Section 4.13(b), it would have been simple to say so expressly. Indeed, when the parties to the Stockholders Agreement intended to vest exclusive authority to a subgroup of directors, they knew how to do so by providing that such a group "solely" or "only" would have the authority to take specified actions enumerated elsewhere in the Stockholders Agreement.[125]

For the reasons explained above, the court denies Defendants' motion to dismiss Count III and turns next to analyze the breach of fiduciary duty claims

---

sue derivatively, [it] would be void as against public policy." *Id.* The court does not need to reach this issue.

[124] Compl. ¶¶ 16-19, 50; *see supra* Part III.A.

[125] *See e.g.*, Stockholders Agreement at 2 ("'Disinterested Director Approval' shall mean the . . . approval of a special committee . . . comprised *solely* of Independent Directors"); *id.* § 3.03(a) ("a tender or exchange offer may *only* be effected with Disinterested Director Approval").

against the Individual Defendants in Count IV that arise from the alleged breaches of the Stockholders Agreement.

### 2. The Breach of Fiduciary Duty Claim (Count IV)

Count IV asserts that the Individual Defendants breached their fiduciary duties by causing and failing to remedy the Company's breaches of Section 3.01 of the Stockholders Agreement. As a remedy, the Complaint seeks to enforce the Stockholders Agreement to require the JAB Entities and the Company "to cause to be elected to the Board four independent directors who are disinterested as relates to the [JAB Entities] and their respective affiliates."[126] All of the Individual Defendants seek dismissal of this claim, but on two different grounds. Both grounds for dismissal fail.

The Outside Directors assert Count IV should be dismissed as to them on the theory they relied in good faith on the belief that the Independent Director Representation in Section 3.01 applies on a going forward basis. The flaw in this argument is that it is untethered from the allegations of the Complaint, which call into question the Outside Directors' good faith with respect to the composition of the Board.

The Complaint specifically alleges that the Outside Directors intentionally: (i) submitted false questionnaires omitting their ties to JAB,

---

[126] Compl. at 103 (Prayer for Relief ¶ E).

(ii) entered into a mutually self-interested bargain with JAB regarding the Independent Director Representation, (iii) misled Coty's minority stockholders about their lack of independence in the Recommendation Statement, (iv) appointed two new non-independent directors to the Board in violation of Section 3.01(b), and (v) then re-nominated and recommended to stockholders a slate of directors that included no Section 3.01 Independent Directors.[127] Based on these allegations, which support an unchallenged claim for breach of fiduciary duty against the Outside Directors in Count I,[128] it is reasonably conceivable that those directors knowingly caused the Company to breach Section 3.01(a) in a self-interested manner in order to retain their directorships and remain in JAB's good graces.[129]

Turning to the JAB Directors and Laubies, they argue it is not reasonably conceivable that they breached their fiduciary duties in connection with any alleged violation of the Stockholders Agreement because only the Section 3.01 Independent Directors have the authority to enforce that agreement.[130] As discussed above, however, the authority delegated to the Section 3.01 Independent Directors to

---

[127] *Id.* ¶¶ 117, 154-56, 176-78, 187, 204.

[128] As discussed above, the Outside Directors did not seek dismissal of the breach of fiduciary duty claim asserted against them in Count I with respect to stockholders who tendered and sold their shares.

[129] Compl. ¶¶ 187-88.

[130] JAB Opening Br. 59.

34

enforce the contract is non-exclusive.[131] Thus, it is reasonably conceivable that the JAB Directors and Laubies could have a role as fiduciaries of the Company to remedy a breach of the provisions of the Stockholders Agreement governing the composition of the Board. Indeed, the Stockholders Agreement provides that Section 3.01 Independent Directors are to be nominated by the Remuneration and Nomination Committee of the Board, which includes a JAB Director (Harf), and approved by the full Board, which includes all of the Individual Defendants.[132] The Complaint also alleges that the JAB Directors and Laubies played a role in electing non-independent directors in violation of Section 3.01.[133]

In sum, Plaintiffs have pled facts sufficient to support a reasonably conceivable claim that the Individual Defendants breached their fiduciary duties by causing and failing to remedy the Company's alleged breaches of Section 3.01 of the Stockholders Agreement.

---

[131] *See supra* Part III.C.1.

[132] Stockholders Agreement §§ 3.01(a) & (b); *see* Regan Aff. Ex. C (Coty's Schedule 14A filed on September 25, 2019), at 10. The court may take judicial notice of Harf's membership on the Remuneration and Nomination Committee of the Board because it is not subject to reasonable dispute between the parties. *In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006) ("[I]n acting on a Rule 12(b)(6) motion to dismiss, trial courts may consider hearsay in SEC filings to ascertain facts appropriate for judicial notice under Delaware Rule of Evidence 201. . . [however] it [can] only take judicial notice of facts not subject to reasonable dispute.") (internal quotation marks, alterations, and citations omitted).

[133] *See* Compl. ¶¶ 176-78.

35

## D. Harm to the Remaining Stockholders

Defendants argue that the class claims must be dismissed as to the Remaining Stockholders because they purportedly did not suffer harm. Specifically, Defendants contend that, accepting as true Plaintiffs' allegation that JAB controlled Coty before the Tender Offer as the holder of approximately 40% of its shares, the stockholders who continued to own stock in Coty after the Tender Offer were not harmed because they were not differently situated than they were before the Tender Offer. According to Defendants, "Plaintiffs try to split hairs about the meaning of control" and the "distinction Plaintiffs try to draw between the power provided by mathematical control and *de facto* control is not recognized by Delaware law."[134] The court disagrees.

The premise of Defendants' argument comes from legal doctrine Delaware courts use to review corporate behavior. In particular, it is well-settled under Delaware law that a stockholder owes fiduciary duties when "the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[135] This legal framework, however, does not mean that

---

[134] JAB Opening Br. 18.

[135] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

36

a *de facto* controller may not obtain real benefits from securing mathematical control of a corporation in a transaction and, as a corollary, that other stockholders of the corporation potentially may suffer harm as a result of such a transaction.

As our Supreme Court recognized in *Paramount Communications Inc. v. QVC Network Inc.*, "[w]hen a majority of a corporation's voting shares are acquired by a single person or entity, or by a cohesive group acting together, there is a significant diminution in the voting power of those who thereby become minority stockholders."[136] The high court went on to explain that the price to be paid for such a loss of voting power "is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power."[137] Once majority voting control is secured, the high court further explained, the controller unilaterally may "(a) elect directors; (b) cause a break-up of the corporation; (c) merge it with another company; (d) cash-out the public stockholders; (e) amend the certificate of incorporation; (f) sell all or substantially all of the corporate assets; or (g) otherwise alter materially the nature of the corporation and the public stockholders' interests."[138]

---

[136] 637 A.2d 34, 42 (Del. 1994).

[137] *Id.* at 43.

[138] *Id.*

Plaintiffs assert that the Remaining Stockholders were harmed because they: (i) "no longer have any expectation of receiving a control premium for their shares in a future buyout"; (ii) face the risk of an unfair squeeze-out that JAB could effect by written consent; (iii) lost the ability to meaningfully exercise their voting franchise; (iv) lack any "say on basic issues pertaining to the Company," and are thus "subject to the whim and caprice of JAB"; and (v) are negatively impacted by JAB's new supermajority control which "has suppressed and will continue to suppress the value" of the stock price."[139] Although Plaintiffs' do not dispute that JAB's voting power was sufficiently potent before the Tender Offer that it would have to lose a corporate election with a ninety percent turnout by a vote of more than nine to one,[140] the court cannot rule out at this stage of the case that the Remaining Stockholders suffered harm when JAB secured mathematical control of Coty through the Tender Offer.

Indeed, the Recommendation Statement noted the loss of the ability to obtain a control premium in the future as a "negative factor" and recognized the potential value to JAB of "obtaining a majority ownership stake":

[139] Compl. ¶¶ 174-75, 179-80, 182.

[140] JAB Opening Br. 20 n.8; JAB Reply Br. 7 (Dkt. 93).

The Special Committee considered the fact, that prior to consummation of the Offer, the JAB Group has the ability to exercise significant influence over decisions requiring stockholder approval, but does not currently have a majority ownership stake, however, *Offeror's obtaining a majority ownership stake following the Offer would clearly prevent other third parties from acquiring the Company without the JAB Group's consent, which may decrease the likelihood of a subsequent sale of the Company, or that minority stockholders receive a control premium for their Shares upon any such subsequent sale of the Company*, notwithstanding the provisions of the Stockholders Agreement intended to protect the minority stockholders' ability to receive a premium for the purchase of their Shares in the event of future strategic transactions involving the Company.[141]

In sum, it is reasonably conceivable that the Remaining Stockholders were harmed as a result of the Tender Offer. Accordingly, the court will not dismiss any of the claims at this time so as to preclude the Remaining Stockholders from seeking to obtain relief.

## IV. CONCLUSION

For the reasons explained above, all of Defendants' motions to dismiss the Complaint are DENIED.

**IT IS SO ORDERED.**

---

[141] Recommendation Statement at 23-34 (emphasis added). The excerpt quoted above acknowledges that the Stockholders Agreement may not ensure that minority stockholders receive a premium for their shares in a future strategic transaction. To that end, the Complaint asserts that the Stockholders Agreement could be amended by Coty's allegedly conflicted Board to remove the protections therein. Compl. ¶ 141 n.8. The Complaint's allegations concerning the alleged failure to comply with the independence requirements embedded in Section 3.01 give credence to this contention. *See supra* Part III.C.